22-1438 Rocky Mountain Wild v. Dallas. Good morning, Your Honors, and may it please the Court. Caitlin Shugart-Schmidt here on behalf of the Federal Appellants. At Council's table with me is Counsel for the Private Landowner, LMJV. I will try to keep to 10 minutes here, reserving three for rebuttal and leaving the balance for LMJV, and keep an eye on the clock. Your Honors, the Federal agencies here did exactly what this Court held they must do under ADHCA, which is to provide LMJV with access to its private property. In doing so, both the Forest Service and the Fish and Wildlife Service correctly considered both the Federal action itself, the grant of the right way, along with all effects of that action, including the expected eventual development of the village at Wolf Creek. Instead of looking to that thorough and consistent analysis, the District Court here summarily held against the agencies via the law of the case doctrine. Now more than three decades after the original land exchange, we ask this Court to exercise its jurisdiction and reverse the District Court so that the agencies may proceed in granting and meeting their legal obligation to provide access under ANUCCA. Focusing first on jurisdiction, the District Court's decision was a remand order, wasn't it? Yes. So do we have jurisdiction over this matter? Yes, I think that this case clearly meets the practical finality exception to the administrative remand rule. I'm happy to go through the specific components of that in terms of the importance and urgency of this matter, and also ultimately the balancing test about the value in resolving this now versus waiting until some later point in time to do that review. But I also think it's in the judicial interest to hear this case now in the sense that these are tricky issues that have serious implications for how the agency and the private party does their work moving forward. I mean, that sounds like the administrative remand rule would have no force if we used that. There are many, many important cases that may need to be heard, but it would be helpful, as you suggested, to go through the point-by-point on practical finality. Sure. So to begin with, this case I think is clearly important in the sense that it determines the scope of a NEPA analysis that a federal agency needs to undertake. Now, NEPA analysis, as this Court is well aware, is a complicated process that requires a lot of agency time and commitment of resources, and putting the agency in a position where it has to consider NEPA alternatives that it can't actually ultimately implement would be a serious drain on agency resources without any sort of corresponding ultimate benefit. Well, the agencies wouldn't have any ability then to appeal as to the District Court's decision. Right, and I think that's true for both the NEPA and the ESA issues here, which is why it's important that this Court address both at this time. And how does it affect the analysis that we have a mandate from our prior opinion that says give them access? I think that's an important consideration for why we are here today, appealing this District Court decision instead of attempting to go back and comply with this rather untenable remand, because it has now been more than 30 years since the original land exchange occurred. The agencies have tried multiple times to provide the access that they are required under ANOCA to provide. I think they have done so here in a manner that is thoroughly reasoned, well-researched, extremely consistent with their overarching statutory obligations, and the time has come for this right-of-way to be granted, and I want the agency to have that access. To agree with you, do we have to interpret Judge Mache's analysis of direct and indirect effects as limited to the land exchange? So I think, first of all, Judge Mache didn't actually, I would say, come to a holding with direct and indirect effects. Right, Judge Mache said as much in her order. He certainly talks about it in the abstract, but there was no specific deficiency identified in the EIS as a result of this labeling, and I think to that point, when it comes to the direct versus indirect effects issue here, first of all, if there was any such error in the agency's analysis, it would have been harmless because there is no substitution. Well, aren't these merits issues? I mean, we're focused now on jurisdiction. Sorry, Your Honor. I mean, aren't you conflating them right now? You're right. Perhaps I was moving too quickly into the merits issues. I'm sorry. I thought Judge Rossman was still on the practical finality rule, so I may have, you may have lost me in the discussion. Well, I think this conversation certainly gets confusing in the briefing. There's a lot of conflation between the law of the case issue and the jurisdiction issue, the effect of the prior 2017 case and the current case here. Well, let's shift to law of the case. Is this an instance where we have law of the case? I think the district court was plainly incorrect to apply it, but I think regardless of whether or not it was applied correctly, it's certainly not a barrier to this court's review of the underlying merits issues. I think, in particular, you're saying that it is law of the case, but there's an exception? I think that there are three avenues by which the court would look at this. I think the most correct one and sort of the most straightforward is to look specifically to what Judge Meech's decision in 2017 held and see clearly here that those were conclusions, those were holdings, that are just not applicable in any way to the case we have before us. Well, it's a new record of decision, right? It is a new agency action. New agency action. I think that's the second avenue by which this court can simply say law of the case was not correctly applied here because we are talking about the substantively different new agency action and new record of decision. Okay, there may be flaws in the decision that carried over, but it's a new agency action and it's a different federal action. It is absolutely a different federal action. It is the selection of a different alternative and a new draft record of decision was produced, a new final record of decision was produced, a new biological opinion and consultation was done. This is, I think, very clearly a new agency action and the district court erred to apply law of the Okay, can we turn to ANILCA, or A-M-I-L-C-A, as I call it. ANILCA. That is an interesting statute and I'm a little uncomfortable relying on legislative history after the fact, but it seems to me that we have already decided this issue. Yes, I don't think this court needs to do anything to look into the specific application of whether, sorry, look into whether or not ANILCA applies in this instance because a prior panel of this court has said in a non-binding opinion certainly that ANILCA applies to this specific case, but further the U.S. v. Jenks case from many years ago held conclusively and it was necessary holding to the resolution of that case that this provision of ANILCA applies in the lower 48 states. Yeah, I mean, is it something, I mean, are we right? Yes, and I hope that the detailed analysis and the briefing of both the statutory language, long-standing agency practice, and the legislative history associated with the act makes clear that this court is right, but regardless this court is bound by the prior panel decisions on this issue. Right, I'm sorry, if I could jump in, your point is that it doesn't matter if we're right because we're bound. Well, I think you are both right and bound. Okay, but it is true that it doesn't matter if we were right. I think that that's correct. I think this court is bound by the prior decision of Jenks because it was a necessary holding. Well, wasn't it dicta in our first decision? I don't think so because I think that the, sorry, do you mean that the 2018 non-binding decisions about this case or the Jenks case? The Jenks case. I don't think so. As I read that case, it seems that the determination that ANILFA applied was what gave, what made this court believe that the Forest Service had the authority to require and implement a permitting system in the first place, so I think that that was a necessary conclusion for the outcome of that case. What about Sturgeon v. Frost? Has the Supreme Court suggested that we might be wrong? I don't think so. I think all of the cases that are cited to you by the Supreme Court after the Jenks decision really deal with other provisions of ANILFA and not this one that specifically talks about land access with respect to Forest Service infill lanes, in which this court and other courts have affirmed or have held it applies to the lower 48 states, and nothing that the Supreme Court has held since has indicated otherwise. I notice that I only have about a minute left at this point, but I'm happy to turn to either the ANILFA or the ESA merits issues if I raise a particular interest. Are you doing ESA? I'm happy to do both, to talk about both. We want the court to resolve both issues. Yeah, shouldn't you have to have complied with Section 10? No, I don't think so. I think in a really important... Well, you're not, it's not, you're not, the development isn't a federal action, is it? Correct. It is absolutely not a federal action, but it is clearly, clearly an effect of the federal action, and that's how we should want the ESA to function. We should want an agency to look at what the federal action is, to look at what the expected effects of that federal action is, and then to scope its biological opinion, discussing the impact of those effects, and ultimately its incidental take statement to cover that same range. That allows it to put restrictions and controls on both the federal actor and the private party in order to ensure conservation measures are in place. Well, I'm not sure it matters so much what I think, how I wish the agency would behave. I think it matters what it says, and it says Section 10 is for non-federal actions. Well, it says Section 10 is for non-federal actions that don't have a federal component or a federal applicant, and that's clearly not the case here. There's a lot of discussion in the briefs and in the record about agency individuals being concerned about the application of Section 7 versus Section 10, but all of those are in the land exchange context, not in the context of the grant to the right-of-way, and that's when we included that agency guidance that goes all the way back to 2003, which discusses precisely these circumstances and why it's beneficial to have an incidental take statement that follows the full scope of the federal action and all of the... Are you asking us to defer to the agency guidance? I think that this court can look to the text of the ESA itself, determine that this is the best interpretation of that language, and rule accordingly. And the best interpretation of that language is that an applicant shall have the ability to be covered under an incidental take statement if it is an applicant for purposes of a Section 7 consultation. Okay, I'll let you switch unless... Good morning, Your Honors. May it please the Court, I'm Aaron Balor representing LMJB. For 37 years, my client has been denied the access to its land that Amilca guarantees, and that this court held it must have. This court has the power to end that denial and delay by affirming the Forest Service's issuance of an easement, and we're here asking this court to do that. And I think that's what's most important to you. So if you have questions, I invite them. Otherwise, I'm going to make three points and make you four if I have the time, Your Honor. First, the harmless error argument here is stronger in a way than perhaps we've ever seen in this kind of case, because not only must the access be granted, but the same road is going to be built in the same place, regardless of whether this stays the government's land, which it is now, or if they were ever someday to do a land exchange. And this is clear from the EIS. It's page 2386 in our appendix. It's the very same thing. So the only real question here is, should the easement remain in place for as long as the government holds the land? And it should, because the analysis required to do what they had to do under Amilca were done. So the second point is, there was a big discussion about whether this was a direct effect or indirect effect, whether this is federal or private. Now, the government treated it entirely consistently, both for NEPA and the endangered species. It always treated it as an indirect effect of a government action. What difference does it make in the NEPA analysis? Zero. It makes no... It makes a difference, Your Honor, to whether a NEPA analysis triggered in the first place, whether there's any major federal action in the first place. But once there is, all the effects are analyzed. And now, under the Endangered Species Act, Your Honor, it was mandatory for them to address us under Section 7, because you have to address all of the effects that will be caused by the government action, and they're required to both consider those effects and then address any mitigation. And once they've done that, the regulations say you don't have to redo it under Section 10. Regardless, though, Your Honor... So it was correct, but regardless, again, the same road is going in the same place, the same development. And so this is where we get to the error the district court made in vacating this decision. We pointed out how the district court said, you have to show extraordinary effects not to vacate, and how that's completely backwards under this court's law, they have to show extraordinary effects the other way. And so under this standard, this decision should stand after 37 years. I'm still confused on why it wasn't required that you comply with Section 10 of the Endangered Species Act. Yeah, let me walk through the logic, and this isn't our... So number one, first of all, the Forest Service had to consult with Fish and Wildlife Service, because granting an easement is an agency action. We're all there. Second, it had to consider take from the development, because under the regulations 50 CFR 402.02, private effects that are enabled by it and are caused by it must be enabled. So they had to consult, they had to consider our development. Once they did that, they had to issue an incidental take statement, establishing reasonable and prudent measures to minimize. Those measures don't just apply to the government, they had to apply to us. And that's under both the statute directly, that's 16 U.S.C. 1536b4 and the regs, so the Chevron deference issue is in play. And then once they had addressed it and imposed measures on us, then of course the incidental take statement would cover us, and then the regulations say, if you've already done it, you don't have to do it again. Section 10 is for private effects or private developments that don't have this federal cause, and that's why you didn't have to repeat it here, Your Honor. When you say that Section 10 is for private developments that don't have a federal cause, I think that's what you just said, where do you see that in Section 10, that it's limited in that way? Yeah, where I see it, Your Honor, is in 50 CFR 402.14 sub I sub 5, and it says when take is allowed by an incidental take statement, no other authorization or permit under the act is required. And so that's the logic I went through, because the agencies already had to do it under Section 7 and did, and as the government said, you want the agencies to do it, because at that point they consider the full effects, and they can impose conservation measures. Now here, they found that there wasn't going to be any threat to the preservation of links, regardless of any cause of conservation. So the conservation is a bonus, but you definitely want that built into Section 7. I'm going to stop for now, Your Honor, unless you have more questions, so we can reserve rebuttal time. That's fine, thank you. Oh well, I guess I should check with my colleagues. Good morning, Your Honors. My name is Travis Stiltz, Energy and Conservation Law. I represent the FLEC conservation groups here. Co-counsel Matt Sandler is at the desk. One point that I'd like to jump right into is this question of the NEPA trigger. What is the major federal action that triggered NEPA? The major federal action was a request for expanded access. LMJB has access, they've always had, on Forest Service Road 391. Well, they have it in the summer on a dirt road, right? It's actually a gravel road. It makes a difference in western Colorado, that gravel distinction, and there is some pavement and blacktop there. I can't answer the specifics on that at the moment, but that major federal action is the request for expanded utility and road access to the site, because but for that, they can't build the development. Well, the prior action was based on a land exchange, right? The prior, okay, they're in the terms government action, federal agency action, which is a NEPA term. Government action is not really a meaningful term here. Major federal actions in NEPA trigger term, agency action. I think everyone agrees we have a major federal action here that triggered NEPA. Yes. I don't think there's any dispute, but the option that was decided upon in the first record of decision that first came up here and then they dismissed the appeal was for a land exchange. Yes, that was the move. Now they decided the agency withdrew the appeal and they went back the drawing board and they picked a different option, which is an easement. Those that you just described in the parlance of all of these terms with modifiers of action are final agency actions for purposes of judicial review and APA review. So yes, but that is different than the major federal action that triggered NEPA review or the agency action. What you described were major, I'm sorry, final agency actions that triggered APA review. And when we go back and look at what that underlying federal action, major federal action, the term used in NEPA and in the regulations, what is sought is the same in all and that is utility and road access for the development of an unlimited up to 10,000 person village under which it's confirmed within the NEPA side of this that there is agency control and authority. Under this board's precedence, under the CEQ regulations, that's what triggers the NEPA process and the ability to look at a range of alternatives to compare the impacts. Those all flow from that major federal action. Here, there was not a clean slate on remand. That's part of our underlying argument. They went back and relied on the same 2014 EIS that hadn't had public comment on it since 2012. Why wasn't there a clean slate on remand from Judge Meech's order? I mean, I guess my real misunderstanding that I hope you can clarify is if we disagree that the law of the case doctrine applies here, what import, if any, does Judge Meech's order have in the analysis? The Judge Meech's order, at its core, and I think it's what this court has said, in the remand order, the Judge Meech remanded for APA violations or, you know, procedural violations under the APA. We think the law of the case is an easy application. Judge Meech's remand is, if law of the case did not apply, then it would be to send the case back to Judge Aguayo for her analysis in the first instance, based on an administrative record that is still in dispute. Contractor records were never produced based on sort of the sequences of how the administrative record in these cases came to be, but we know this court doesn't have a full administrative record in front of it to analyze. Well, we have the record of decision. I mean, we have the administrative record, and we've got a case law that says that we are in a position to go ahead and review the administrative record in the first instance. But you don't have it. You have an appellate record in front of you. There are a considerable amount of materials that were not provided to this court. Judge Aguayo, in her opinion, laid out that she reviewed, I believe it was a 17,000-page administrative record. And we also submit that she didn't reach the questions of, just as Judge Meech did, a resolution of what should be the administrative record. There were some rolling disputes over access to records versus under FOIA, Freedom of Information Act, standards versus what we should be able to get to under the APA standards. We've never had the opportunity to put in front of any court the contractor records that show what was actually done in preparing that 2014 EIS. And as that record shows, and even the appellate record shows, there was considerable influence by LMJB over what should be done in the scope of that analysis. And that's what gets us here. Judge Meech referred, or Judge Keene referred to that influence on, for instance, the ANILCA theories from the agency, or from LMJB, from the applicant who, when they didn't get a legal or a procedural decision that they liked, from Dan Ellis at the supervisor's level, they would, and this is a quote, start rattling cages. We don't have a straightforward path from an application to a decision here. And that's why sending this back with a clean slate to the agency, there's so much mess involved with what has happened since this finally, since this proposed in 2018, and I believe that's in the notice of intent, until now. There's never been a comparison of a range of reasonable development alternatives that could be implemented on this parcel. It's a bunch of concepts. Just, here's some things we might do. There's no real analysis of what may be done. The Corps of Engineers was pushed out of the naming process, even though there's clearly weapons out there. The Federal Highway Administration, again, wanted to participate. We're not talking about a few additional cars coming on and off Highway 160 on the top of Wolf Creek Pass. We are talking about an approval that would allow 9,984 vehicles per day, and that's out of the team of the government's appendix. This is a massive, massive federal action. The proposal for how to get utility access, which is not available under an LRA. How could you say that their development proposal was reasonable in any way, shape, or form? They don't even have utility access. This has been chopped up into segments, both over time, conceptually, legally, to where Judge Maitch and based on his order, Judge Aguayo, carefully looked into it and saw that there was, I believe, some artful dodges, is the colorful language that he used. There was a lot of attempts to minimize disclosure of what is going on at that parcel and what may be reasonable, either under a NALCA, Federal Land Policy Management Act, provides access standards for the scenic easement. There's no dispute out here about federal authority and control over the development. That's undisputed now. The Forest Service plays some games within its briefing, and then also switches gears in the ESA side to say, oh no, now there's no federal agency action, because we want to use Section 10. I'm sorry, use Section 7. There is federal agency action. There's diminished federal agency action. There's a lot of hiding the ball. There's a lot of, I think it's the Lee versus Army case, a lot of sweeping issues under the rug, and trying to untangle all of this has been a challenge for three district courts, one preliminary injunction by Judge Kane, one ruling on the APA merits by Judge Mage, and now an APA ruling partially on the merits, but also partially following the rule, law of the case, which in our view, did Judge Kane's, I'm sorry, did Judge Mage's opinion and reconsideration order mean anything? Well, it's a new day. It's a new record of decision. It's a new agency action. You have a new biological opinion. You had an SIR evaluating whether to implement a new EIS. You know, I don't know how law of the case could apply here. There is no new NEPA. The SIR is not a NEPA document. It cannot be used under this court's, under this circuit's authorities to show compliance. I don't know what you mean, there's no new NEPA. I agree with you, the statute is the same. There is no new NEPA. There was no amendment to the 2014 EIS. There was no public comment period. For anyone to participate in the agency's objections process, they had to have issued comments in 2012. The agency construed their own regulations as saying, if they weren't substantive, we wouldn't even hear you. So NEPA, which involves the twin aims of informing its decision makers and involving the public, shut down in 2012 and then was followed by the 2014 EIS. To me, that's not a law of the case issue. That's a, is this agency action, should it be upheld? Is it arbitrary and capricious? It's not whether it's barred by something that happened when they were looking at the land exchange. With that framing, your honor, I can say categorically, if the federal action now is based on the 2018 proposal for access that LNJD handed and then the Forest Service gave its decision on, there is no NEPA at all. When you say there's no NEPA at all, you mean that they did not comply with the requirements of NEPA? That is correct. There is no analysis of a range of alternatives based on the 2018 application. There is no analysis of what they would do with that access once it went through. If law of the land has a new request and the ANOCA access, there's no comparison of alternatives that would restrict that access. Okay, so there's the NEPA deficiency is there's not a comparison of alternatives. You also think that that's at the heart of it, that you also think, if I'm reading your brief correctly, that they didn't accurately define indirect and direct effects? After all, NEPA is a procedural statute. It pains me when I read court opinions saying over and over that it doesn't go to the substance. There are academic reads that suggest it might have, but that ship has long sailed. But what we have today is a statute that imposes specific procedures with the presumption that they will resolve the protection of the environment. Now we're not even getting those procedures and we have the government out there saying it doesn't matter what category it goes into. And both judges below, and especially I think Judge Kane in his 2017 order, said well, I don't need to figure out what categories things go under. But what we know is they should be direct impacts under the framework of the statute and the regulations because that helps define the range of alternatives and the purpose of need. And NEPA is a process that flows through and you get the opportunity to bring in other agencies and public comments so in order that the agency, the main action agency, the Forest Service, but also other agencies with jurisdiction and control, the Corps of Engineers, Federal Highway Administration, EPA and others, can be cooperating under the one EIS theory and look at it all. Rossi FHA is a classic on segmentation and why that's prohibited. And I think this case really, in a practical way, shows how everything has sort of been chased down. There was no analysis of any endangered species in the NEPA document, which also requires that, based on the 2018 appeal as part of the alternative, part of the impacts analysis, even though there's also an ESA analysis. They do have a new biological opinion for the 2018 and they actually, their different. Yes. It's actually a little better under the easement proposal than it was on the land exchange, if I'm reading it correctly. It still doesn't, it still doesn't open itself to the light of day, which is what the NEPA, the parallel NEPA requirements are. And the traffic studies and the underlying data is plucked out of the pre-2014. When you have to show somehow that it had changed and, I mean, as I read the case law, it's not enough to say you made a mistake. You have to show that that mistake has caused some kind of impact, a negative impact, on the old traffic study. Wouldn't it be your burden to show that a more recent traffic study would have would have been different than the one that they relied on and different in ways that would would weigh against approving the project? The last opportunity to provide that evidence in a closed record since 2012. We're stuck with the environmental and administrative record in the challenge in 2017 in front of Judge Aguayo and also here. You'd have to move that in under a part of the problem that was not assessed. But what we, so when things come in in an administrative proceeding, you know, they differ from what the court is perhaps more used to in the trial, but there are a lot of similarities. And that's when a superior body makes a ruling the inferior body should follow. And the forester said flat out, we're not going to follow Majors. Judge Majors ruled. Well, they followed in the sense that they didn't try to push through a We're going back to the drawing board. And that happens all the time, doesn't it? They didn't go back to the drawing board, if I may disagree with your honor. They went back to the same EIS, did not meet the agency's NEPA duties. As Judge Majors ruled, as the court recognized, and Judge Aguayo followed. They went back and just did that. And the end of the road here, pardon the pun, I guess, is the development. The decision was really the same. You can have roads to develop as much property as you want, and that will end the federal control and authority over this project. Of course, that's contrary to the record. It's contrary to the scene engagement. It's contrary to ANILCA. It's contrary to FLTMA. Let me ask a question, and correct me if I'm wrong. We don't yet have a plan of the development that's been approved or disapproved yet, right? There's never been a plan offered to the Forest Service. Right. Only a bucket full of concepts. Okay. That's not what NEPA does. I understand, but so at this point, we don't know what's going to be approved for that development. The Forest Service position is, we'll never know because this is it. What is it? This approval gives... CARP launch? CARP launch to go out and do whatever they please going forward. Okay. That's their position. Our position is this really needs to go back and have a clean slate because when you start parsing through this, it's confusing. It's not clear. Before you're out of time, I wanted to ask you to clarify something that you said that if we find that the law of the case has no application here, you said that we should send this back to Judge Arguello because the record is in dispute. I'm not sure I know what you mean by that, if you could clarify. In what way would the record look different if we held there was an error in relying on law of the case and the district court now needs to do what and based on what evidence? The record developed when the EIS was being carried out in 2008 through 2014 is incomplete. A parallel case came up under FOIA concerning contractor records that we weren't able to get under NEPA. I'm sorry, we weren't able to get under FOIA, but the court ruled a different set of standards apply to an APA administrative record. Those decisions were made after Judge Meech, I believe, and the sequence of those. We've never had the opportunity to go after the original administrative record that underlies the final agency action that, you know, there's two different final, three different final agency actions, I think, two different final agency actions, but that underlays the major federal action on which the NEPA analysis was based. I see I'm out of time. Thank you. I would appreciate it if you would start with the question about the record that Judge Rossman just asked. Do we have a record that's in dispute? No, the record here is not in dispute, and this court can absolutely rule on the three issues that the federal appellants have asked this court to rule on. That is the scope of the federal action under NEPA, the correct categorization of direct or indirect effects, and the sort of function of Section 7 and Section 10 without, on exactly the record you have before you today. And has that record been closed since 2012? No. In fact, the original EIS had a huge number of public comments, many of which were supportive of the land exchange. After that point in time, when the draft record of decision in this case, for this case was issued, comments were again accepted. Those are available in the record page 640 in our appendix, and I would encourage you to go back and look at both the detail with which the Forest Service engaged with the questions and comments that were submitted, and also the way it thoroughly considered the scope of issues that were raised there in the final record of decision, which is also available in our appendix. So that would be in around 2018, 2017? Yes, but thinking backwards, right, the draft record of decision was issued in 2018. The final record of decision came shortly after. This case has now been in litigation for almost four years, although those seem like farther back in time points. They were quite contemporaneous with the actual action of issue. And the agency is the one who designates the record, the rod, right? Correct. Okay, correct. I want to make one other point, if I can, on the Section 7 versus Section 10 apparent conflict. I think that there's a perception that sort of flows through Petitioner's Brief that somehow the agency is trying to get away with something by not somehow imposing Section 10 on LMJB. And so I just want to make clear a couple of things about the relationship there. The first is that the decision to participate in a Section 10 process is voluntary on the part of an applicant. The federal government has no authority to force a private applicant to go through that process unless they otherwise want to. So in this case, if LMJB was told that it was not able to be covered by the Section 7 process as the ESA permits, the agency wouldn't have any ability to enforce those conservation measures on LMJB unless they voluntarily chose to seek protection from the take liability of the one lease that's expected to be harmed as a result of this development. If they don't choose to engage in that process willingly, the agency loses the ability to implement the reasonable and prudent measures that benefit conservation. So there's a real conservation benefit here to having this comprehensive connected Section 7 process and not a separate Section 10 process, which doesn't necessarily produce any higher conservation benefit and is voluntary on the part of a private applicant. I know we're very limited in time, so if this Court has further questions for me, I'm happy to answer them. Otherwise, I will research the balance for Interveners Council. We ask this Court to reverse. Thank you. Your Honors, this Court can review the Forest Service directly regardless of what the District Court did. That's your Olin House decision. The entire record is before you. It is closed. The FOIA suits the Council referred to both came to this Court and they lost both times. There's been no hiding the ball on this development. I'd point your Honors to your It shows that before the SENA easement was granted in May 1987, we applied for and got water rights for 2,444 units publicly. The largest development that's considered and assessed here is below that. This has always been clear. And as the timing, your Honors, we've lost the 80s and the 90s and the aughts and the teens. We don't want to lose the 20s again. This is a direct review by your Honors in the full records there. If you have more questions, I'm glad to answer them. Who has the final say over what the development will be? There will be many agencies down the road that will have that. Mineral County is the direct regulator. It's the one that does the zoning, the planning, and all of that. But of course, this is just an easement to build a road. CDOT is going to actually have to approve a connection to Highway 60 on that. If there are permit things, there are water rights that are going to have to be considered. And so, your Honor, this is step one of a lot of steps. And so the idea that this is going to be unregulated by anyone going forward is completely wrong. And the 800-page environmental impact statement, your Honor, you guys helped me remember to analyze three different levels of development because I said we don't know exactly what's going to happen. We're going to analyze all of them. And none of the labels that Council is complaining about affected in any way that analysis, whether it's direct or indirect. They were all still analyzed. The water, the wildlife, everything was analyzed on here. And so I said there has to be a road under ANILCA. It has to be in this location. The only question is, you know, is this easement going to be there to allow it as long as the land is the government's? Maybe it'll try it and decide to exchange later. That's all. I'm going to ask you to wrap it up. I'm done, your Honor. Thank you very much. Thank you. We will take it under advisement.